UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
                                    )
JAEAR WILLIAMS.                     )
                                    )
            Petitioner,             )
                                    )
                 v.                 )        Civil Action No. 09-10237-JLT
                                    )
GARY RODEN,                         )
                                    )
            Respondent.             )
_____ )


REPORT AND RECOMMENDATION ON
PETITION FOR WRIT OF HABEAS CORPUS.

April 6, 2010


SOROKIN, M.J.

        On February 17, 2009, Jaear Williams, proceeding pro se, petitioned for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death

Penalty Act of 1996 (AEDPA).  Docket #1.  The Respondent, Gary Roden, opposes the Petition.

Docket #13.  Pursuant to an Order of Reference dated March 9, 2009 (Docket # 8), I recommend

that the Petition be DENIED.

I.      PROCEDURAL BACKGROUND

        On November 23, 2003, after a jury trial before Massachusetts Superior Court Associate

Justice Patrick F. Brady, Williams was found guilty of first-degree murder.  See Respondent's

Supplemental Answer (S.A.), Ex. A at 7.  The Court sentenced Williams to life in prison.  Id.

On November 26, 2003, Williams filed a motion to set aside the verdict, which the Court denied.

Id. at 8.  On December 12, 2003, Williams filed a Notice of Appeal and on March 9, 2005, he

filed a motion to stay his appeal with the Massachusetts Supreme Judicial Court ("SJC"). S.A.,

Ex. C. at 1.  On August 15, 2005, Williams filed a motion for a new trial with the SJC that was

remanded to Plymouth Superior Court. Id.  at 2.  In his motion for new trial, Williams asserted

inter alia an ineffective assistance of counsel claim. See S.A., Ex. D at R.A.12. On November 2,

2005, after a non-evidentiary hearing, the trial court denied Williams's motion for a new trial.

S.A., Ex. A at 7.  Williams appealed. Id.

In his consolidated appeal to the SJC, Williams asserted eight claims: (1) that it was error

for the trial judge not to give a limiting instruction that a co-defendant's statements were not

admissible against Williams; (2) that the co-defendant's statement on the telephone suggesting a

beating of the victim was not admissible against Williams as an adoptive admission; (3) that

police witness's testimony suggesting that Williams had given a false alibi posed a substantial

likelihood of a miscarriage of justice; (4) that several "red herrings" and inconsistencies in the

Commonwealth's evidence posed a substantial likelihood of a miscarriage of justice; (5) that

there was insufficient evidence to convict Williams as a joint venturer; (6) that the court erred in

refusing to re-instruct the deliberating jury on joint venture; (7) that the motion to set aside the

verdict should have been granted because the co-defendant Ennis presented a defense hostile to

Williams; and, (8) that the motion for a new trial should have been granted because Williams'

trial counsel failed to summons a television news videotape which would have shown that

prosecution witness Tanya Brimage was lying on a key point. See S.A., Ex. D.

On February 13, 2008, the SJC affirmed Williams' conviction. Commonwealth v. Jaear

Williams, 450 Mass 645 (2008).  On February 17, 2009, Williams filed the above-entitled action,

raising the same eight claims he had raised before the SJC. Docket # 1.  Briefing was completed

by May 4, 2009. Docket # 13.   On June 30, 2009, the Court denied Williams' motion to stay

proceedings.

II.     FACTUAL BACKGROUND

The following recitation of the facts by the SJC is presumed to be correct.  See 28 U.S.C.

§ 2254(e)(1); Gunter v. Maloney, 291 F.3d 74, 76 (1st Cir. 2002).

> Both the [Petitioner] and Ennis sold drugs, both on the street and, during December, 1999, from an apartment that was leased to another at 30 Walnut Park in the Roxbury section of Boston. Michael Lee, the victim, who lived in Brockton, also sold drugs, and dealt in larger quantities than did the [Petitioner] and Ennis. The mother of one of the victim's children lived on Walnut Park. The victim and Ennis were friends. The victim associated with two individuals who lived in Philadelphia, Pennsylvania, namely, Michael Brown and Gregory Carter. Carter was the half-brother of Steven Knight. Knight knew the victim as well as the [Petitioner] and Ennis. In December, 1999, Knight was incarcerated, and while he was incarcerated, his girl friend, Tamika Wilson, and her friend, Tanya Brimage, lived at Knight's apartment on Staniford Street in Boston. The [Petitioner] was a friend of Wilson, and would sometimes stay at the Staniford Street apartment.

> The victim was last seen at about 10 P.M. on December 25, 1999, with the mother of one of his children outside her residence on Walnut Park. In her company, the victim spoke to someone on his cellular telephone and asked, "Is that you in the gray car?" There was a gray automobile within sight. The victim told the person on the telephone that he was just going to take his family upstairs and then would be right back down. The victim had been speaking with the [Petitioner].

> On the morning of December 26, 1999, the victim's automobile was towed from a wooded area adjacent to a parking lot of a school in Brockton. Two days later, on December 28, after the victim's sister reported the victim missing, his body was discovered in the trunk of his automobile at an automobile recovery yard. The victim's body had been wrapped with duct tape with a pillowcase placed over his head. The victim had been beaten, bound, and shot five times. He had been shot once in the jaw, once in the neck, twice in the chest, and once in the legs.

> Investigation revealed that the pillowcase placed over the victim's head matched one recovered from the apartment at 30 Walnut Park, from which the [Petitioner] and Ennis sold drugs. Cellular telephone records indicated that between 1 A.M. and about 4 A.M. on December 26, the cellular telephone that the [Petitioner] possessed was used in

Quincy, Braintree, Randolph, Avon, Brockton, and Holbrook. There was also ballistics evidence. Five .380 caliber automatic discharged cartridge casings and one live .380 caliber automatic bullet were recovered in the vicinity where the victim's automobile had been in the woods. All of the discharged cartridge casings had been fired from the same semiautomatic weapon. Two spent projectiles were recovered from the victim's body, and a third spent projectile fragment was recovered from the trunk of the victim's automobile. All three projectiles were consistent with .380 caliber automatic ammunition and had been fired from the same weapon. No weapon was recovered.

Early Christmas morning, the [Petitioner], Carter, and another man went to the Staniford Street apartment belonging to Knight. A few hours later, Knight, from a house of correction, spoke with Carter on the apartment's telephone. Later that day, at about 7 P.M., Knight called the apartment again. The [Petitioner] was present and spoke with Knight. The [Petitioner] indicated that he was going to take care of a problem. Knight asked, "Mike Lee [the victim]?" The [Petitioner] replied affirmatively.

At about 5 A.M. on December 26, Brimage let the [Petitioner], Ennis, Carter, and another man into the Staniford Street apartment. Brimage went to sleep. She woke up after 8 A.M. to find the [Petitioner] and Ennis present. Later, the [Petitioner] unzipped a blue backpack and pulled out a gun and showed it to Ennis. Ennis said, "Damn, you almost emptied the clip on that nigger." The [Petitioner] laughed and said, "Shit."

At about 7 P.M. on December 26, the [Petitioner] visited his friend Renee Phillips at her apartment. Referring to the victim, the [Petitioner] told Phillips, "We had to take a ride with him last night." He went on to say, "Well, I had to leave that nigger in his trunk."

During the evening of December 28, at the Staniford Street apartment, the [Petitioner] asked Brimage if she had heard that the victim had been killed (Ennis was not present). Brimage stated that she had not. The [Petitioner] told her that it was on the news and that the victim had been killed in the woods. Brimage turned on the news. While she was watching, Knight telephoned. The [Petitioner] spoke with Knight, and during their conversation, the [Petitioner] used the phrase "lights out." Afterward, Brimage asked the [Petitioner] what the television report on the victim's death meant by a "gruesome discovery" found in the trunk of an automobile. The [Petitioner] said that the victim had been shot in the head, the neck, and the face, and "everywhere." As the [Petitioner] headed out of the apartment, Brimage told the [Petitioner] that he needed to keep quiet. The [Petitioner] replied, "I don't care because if I go down, so don't a whole lot of other people." The [Petitioner] went on to say that he never should have brought Ennis with him.

The [Petitioner] attempted to evade police, but was arrested on January 2, 2000, in the Walnut Park area. He received Miranda warnings and told police that on Christmas Day, he had called the victim and had made arrangements to purchase one hundred

4

dollars' worth of marijuana from the victim that evening. The [Petitioner] then headed on foot to 38 Walnut Park to see Wilson. While the [Petitioner] was heading into 38 Walnut Park, at approximately noon or 1 P.M., he ran into the victim, who was walking out of that building. The victim could not confirm that the drug deal would occur. The [Petitioner] made plans with the victim to meet on Walnut Park at about 10:30 P.M. that evening. The [Petitioner] then visited with Wilson for almost one hour. He later borrowed a motor vehicle and drove to Plymouth, visited Knight, and then returned to Boston. The [Petitioner] stated that he went to the Staniford Street apartment. He unsuccessfully tried to contact the victim. The [Petitioner] returned to Walnut Park at 10:30 P.M., but the victim did not appear. The [Petitioner] met up with Ennis. The [Petitioner] parted with Ennis and went to a club, where he stayed until 2 A.M. on December 26. The [Petitioner] returned to the Staniford Street apartment. The [Petitioner] said he learned of the victim's death from the news on either Monday, December 27, or Tuesday, December 28.

Neither the [Petitioner] nor Ennis testified, and they did not call any witnesses to testify on their behalf. The [Petitioner]'s trial counsel suggested that it was Carter, not the [Petitioner], who had killed the victim. He argued that Brimage and Phillips were not credible witnesses. He further pointed out that there was no forensic or ballistics evidence implicating the [Petitioner] and that there were inadequacies in the police investigation.

Williams, 450 Mass. at 646-49

III.   DISCUSSION

A.   Habeas Corpus Standard of Review

Williams cannot obtain federal habeas relief under 28 U.S.C. § 2254(d)(1) unless he can show that the Massachusetts courts' decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  A legal principle is "clearly established" within the meaning of this provision only when it is embodied in a holding of the United States Supreme Court. Thaler v. Haynes, --- S.Ct. ----, 2010 WL 596511 (U.S.2010) (citing Carey v. Musladin, 549 U.S. 70, 74 (2006); Williams v. Taylor, 529 U.S. 362, 412 (2000)).

The "contrary to" prong is satisfied when the state court "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," Taylor, 529 U.S. at 405, or if "the

state court confronts a set of facts that are materially indistinguishable from a decision of [the

Supreme Court] and nevertheless arrives at a [different] result," Id. at 406.  The "unreasonable

application" prong is satisfied if the state court "identifies the correct governing legal principle

from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the

prisoner's case." Id. at 413. Moreover, "a federal habeas court may not issue the writ simply

because that court concludes in its independent judgment that the relevant state-court decision

applied clearly established federal law erroneously or incorrectly. Rather, that application must

also be unreasonable." Id. at 411.

  B. Ineffective Assistance of Counsel

  Williams claims his trial counsel was ineffective in failing to subpoena a FOX news

broadcast concerning the discovery of the victim's body for use in impeaching Brimage's

testimony.  Specifically, Williams avers his "belief" that the broadcast showed the area of the

discovery of the victim's body, which evidence would undermine Brimage's claim that Williams

(as opposed to the FOX broadcast) was the source of the information to which she testified

concerning her understanding of the location where the body was discovered.

  To succeed on a Sixth Amendment ineffective assistance of counsel claim, a habeas

petitioner "must establish that (1) 'counsel's representation fell below an objective standard of

reasonableness,' and (2) 'a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different.'" Smiley v. Maloney, 422 F.3d 17, 20

(1st Cir. 2005) (quoting Strickland v. Washington, 466 U.S. 668, 689, 694 (1984)). "A

reasonable probability is a probability sufficient to undermine confidence in the outcome."

Strickland, 466 U.S. at 694.  A failure of proof on either prong defeats an ineffective assistance

of counsel claim. See Malone v. Clarke, 536 F.3d 54, 64 (1st Cir. 2008) ("[I]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.") (internal quotation marks omitted). The burden is on the Petitioner to demonstrate both deficient performance by his counsel and prejudice by a preponderance of the evidence. See Lema v. United States, 987 F.2d 48, 51 (1st Cir. 1993).

The Court's review of counsel's performance under the first prong of the Strickland test is highly deferential and a Petitioner must show that "given the facts known at the time, counsel's 'choice was so patently unreasonable that no competent attorney would have made it.'" Knight v. Spencer, 447 F.3d 6, 15 (1st Cir. 2006). Counsel's tactical decisions cannot generally form a basis for an ineffective assistance of counsel claim. Murchu v. United States, 926 F.2d 50, 58 (1st Cir. 1991) (("[T]actical decisions, whether wise or unwise, successful or unsuccessful, cannot ordinarily form the basis of a claim of ineffective assistance.") (quoting United States v. Ortiz Oliveras, 717 F.2d 1, 3 (1st Cir. 1983)).

The second prong of the Strickland test requires a Petitioner to demonstrate actual prejudice from the alleged mistakes of counsel. Rice v. Hall, 564 F.3d 523, 525 (1st Cir. 2009). The test applied to ineffective assistance claims in Commonwealth v. Saferian, 366 Mass. 89, 96 (1974), is  the "functional equivalent" of Strickland for purposes of proceeding with a § 2254(d)(1) determination.  Mello v. DiPaulo, 295 F.3d 137, 144 (1st Cir. 2002). Of course, in order to prevail, Williams must not only prevail under the Strickland analysis, but also establish that the challenged state court decision was "contrary to" or an "unreasonable application" of Strickland.

The SJC considered and rejected Williams' claim of ineffective assistance of counsel. It ruled there was no error and that any error was not "'likely to have influenced the jury's conclusion.'" Williams, 450 Mass. at 655 (quoting Commonwealth v. Frank, 433 Mass. 185, 188 (2001)).  It determined:

> The content of the broadcast was speculation.  Further, the point of *potential* impeachment, concerning the location of the victim's automobile, would have been diminished by the absence of impeachment on the issue of the type, and extent, of the victim's injury.  At trial, Brimage recounted that the defendant said that the victim had been shot "everywhere," including in the head, face, and neck, while the broadcast merely reported an unspecified "gruesome discovery." The medical examiner's testimony corroborated Brimage's testimony. The defendant's affidavit in support of his new trial motion was silent on any possible impeachment concerning Brimage's testimony on the type and extent of the victim's injuries. The defendant has not shown that the potential impeachment evidence in the location of the victim's body could have made a difference.

Williams, 450 Mass. at 777 (emphasis in original)(citations omitted).

The SJC applied the applicable federal law.  Williams fails to establish that its application of that law was unreasonable.  There is no evidence that the videotape remained in existence at the time of Williams' trial.  There is evidence that it no longer existed by October, 27 2005. S.A., Ex. D at R.A. 15. The only evidence of the broadcast's content comes from Williams' circumspect affidavit. S.A., Ex. D at R.A. 13.  Even crediting its content, as the SJC did, the tape would have had minimal impeachment significance for the reasons stated by the SJC.  Accordingly, the SJC's decision was neither contrary to, nor an unreasonable application of, federal law.

    C.  Jury Instruction Regarding Co-Defendant's Post-Arrest False Alibi

Williams next asserts error in the SJC's rejection of his challenge to the jury instructions. The SJC recited that:

> After being arrested, Ennis gave a statement to police in which he stated that he had spent Christmas night with his girl friend. In this statement, Ennis also stated that he had known the [Petitioner] for a long time and knew him to be involved in the drug business. Ennis's girl friend testified that Ennis had asked her to lie and tell the police that he had been with her the entire evening of Christmas. The [Petitioner] argues that the judge erred in refusing to instruct the jury that Ennis's post-arrest statement to police and false alibi were not admissible against the [Petitioner].

> There was no prejudice to the [Petitioner]. See Commonwealth v. Braley, 449 Mass. 316, 326 (2007). As to Ennis's false alibi, there is no likelihood that the jury would have found the Commonwealth's case against the [Petitioner] significantly less persuasive without considering Ennis's statements. See Commonwealth v. James, 424 Mass. 770, 783 (1997); Commonwealth v. LeBlanc, 364 Mass. 1, 9-10 (1973). Ennis's efforts to exculpate himself did not corroborate any of the relevant evidence against the [Petitioner]. See James, 424 Mass. at 783. The fact that the jury acquitted Ennis indicates that they did not hold against him his efforts to falsify an alibi, and thus, such efforts could not reasonably be said to be significant evidence against the [Petitioner]. Ennis's statement that the [Petitioner] was involved in the drug business was of no real significance. The fact that the [Petitioner], Ennis, and the victim all sold drugs was undisputed. Ennis's statement to police that the [Petitioner] was involved in the drug business was cumulative of other evidence admitted without objection. See Braley, 449 Mass. at 326 .

> Williams, 450 Mass. at 649-50.

While labeled as a challenge to the jury instructions, Williams is here challenging the admission into evidence against him of Ennis' statement, an evidentiary determination based in state-law. Errors of state law, even if such an error occurred, do not provide a cognizable basis for federal habeas corpus relief. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Lewis v. Jeffers, 497 U.S. 764, 780 (1990). Accordingly, I recommend rejection of this claim.

D. Adoptive Admissions

Williams next challenges the admission into evidence against him on an adoptive admission theory of statements made by co-defendant Ennis. The SJC ruled:

> During the testimony of Knight, a tape recording of a telephone conversation that took place on December 28, among Knight, the [Petitioner], and Ennis, was played for the jury. The jury were permitted to read an informal transcript of the recording

while they listened to the conversation. During the recording, Ennis stated to Knight that he and the [Petitioner] "were kicking his ass nigger." The judge admitted the statement, over the [Petitioner]'s objection, as an adoptive admission.

We reject the [Petitioner]'s contention that there was an inadequate foundation for the judge to admit the statement as an adoptive admission. Contrary to the [Petitioner]'s suggestion, the judge did not state that the [Petitioner] silently assented to Ennis's statements, but found that the [Petitioner] said, "Yo, chill, chill," to Ennis's statements. The [Petitioner]'s remark indicated that he had heard the statement. We agree with the judge that Ennis's statement was the type of statement that the [Petitioner] could be expected to deny if untrue and that the [Petitioner]'s response, "Yo, chill, chill," could be found not to constitute a denial. See Commonwealth v. Sullivan, 436 Mass. 799, 808-809, 768 N.E.2d 529 (2002); Commonwealth v. Babbitt, 430 Mass. 700, 708, 723 N.E.2d 17 (2000).

Williams, 450 Mass. at 650-651.

Williams is again challenging a state-law evidentiary determination. As already noted, such errors of state law are not cognizable in a federal habeas corpus action. Estelle, 502 U.S. at 67-68; Lewis, 497 U.S. at 780. Accordingly, I recommend rejection of this claim.

E. Trooper's Testimony of Defendant's False Alibi

Williams also challenges two statements made by a law enforcement officer testifying at his trial. He claims that the statements were prejudicial because they undermined his alibi. On direct examination, in the course of reciting Williams' post-arrest statement, Massachusetts State Trooper Coppenrath stated that Williams had said on the night of the murder that he (Williams) had left a nightclub because a shooting had taken place. The Trooper added the comment that the "Boston Police Department indicated that no such shooting took place." Tr. 4 at 128-129. The Court sustained Williams' objection, struck the latter comment, directed the jury to disregard the statement,[1] and admonished the witness to answer the question asked – what

---

[1] Specifically, the judge stated: "All right. The objection is sustained. Disregard what the Boston Police reported." Tr. 4/129.

Williams said – without additional interjections.  Later, on redirect, the following exchange occurred:

| | |
|---|---|
| ADA: | Let's go back to Mr. Williams' statement.  He indicated to you that on the night in question he left the Rolls Emporium, or whatever it is, the nightclub, at 2 o'clock? |
| Trooper: | Yes, sir. |
| The Court: | Wait.  I'm sorry.  You say the night in question. Could you be more specific? |
| ADA: | All right.  On the morning of December 26th. |
| The Court: | Mr. Williams? |
| ADA: | Right.  Did Mr. Williams tell you he had left the Rolls for a specific reason? |
| Trooper: | Yes, sir. |
| ADA: | What was that reason? |
| Trooper: | Because of an alleged shooting that took place at 2 a.m. at the Rolls. He left there to go to Staniford Street. |

<u>Tr</u>. 4 at 168.

The SJC rejected Williams challenge to the Trooper's testimony and the trial judge's rulings, as follows:

11

Jurors are presumed to follow a judge's instructions, including instructions to disregard certain testimony. See Commonwealth v. Auclair, 444 Mass. 348, 357-58 (2005), and cases cited.  In addition to his two instructions made at the time of two instances of the objectionable testimony, the judge stressed to the jury in his final charge that, whenever he told the jurors to disregard something, it was not evidence, and they were not permitted to rely on that information in reaching their factual conclusions.  These instructions sufficiently eliminated any potential prejudice to the defendant on the first two interjections made by Coppenrath.

There was no error in Coppenrath's testimony on redirect examination because Coppenrath was simply pointing out that the defendant had stated that a shooting had occurred at 2 a.m. at the club. Apart from this testimony, there was evidence from which the jury could have reasonably inferred that the victim was killed anytime between 10 P.M. on December 25, when he was last seen with the mother of one of his children, and the morning of December 26, when his automobile was towed from the woods next to a school in Brockton. While the defendant told Coppenrath that, after 10:30 p.m. on December 25, he went to a club until 2 a.m. on December 26, and then returned to the Staniford Street apartment, telephone records indicated that he was traveling from Boston to Brockton from 1 a.m. to 4 a.m. on December 26, and Brimage testified that the defendant did not return to the Staniford Street apartment until 5 a.m. on December 26.

Williams, 450 Mass. at 651-52.

Williams waived his challenge to Coppenrath's testimony on redirect by failing to object to the redirect testimony.  The SJC reviewed the claim of error only for a miscarriage of justice. Procedural default constitutes an adequate and independent state ground so long as the state consistently applies the rule and has not waived it. Horton v. Allen, 370 F.3d 75, 80-81 (2004); Gunter v. Maloney, 291 F.3d 74, 79 (1st Cir. 2002).  Massachusetts treats issues not raised at trial as waived and review is limited to the miscarriage of justice standard.  Commonwealth v. Curtis, 417 Mass. 619, 625 n. 4, 626 (1994).  This limited review does not operate as a waiver of the underlying procedural default. Burks v. Dubois, 55 F.3d 712, 716 n.2 (1st Cir. 1995).  Only cause and prejudice can excuse the default, or actual innocence.  Williams has made no attempt to show

either. Insofar as Williams advances a separate claim challenging the adequacy of the trial

judge's response to the exchange during the direct examination of the Trooper, it is waived for the

same reasons. In any event, (and in the interests of completeness in this Report and

Recommendation) I note that Williams has not established that the SJC's decision is contrary to

or an unreasonable application of federal law. Accordingly, I recommend rejection of this claim.

F. Accumulated Errors

Williams argues that "[v]arious points in the Commonwealth's evidence" created a

substantial likelihood of a miscarriage of justice. To support this contention Williams points to

various evidence that was presented to the jury – testimony regarding the recovery of Lee's

glasses from Williams' apartment, DNA analysis of the glasses, blood stained boots, fingerprints

of a third person on the trunk of the car used in the abduction of Lee, and a witness placing

Williams in Boston at or near the time of the murder. Docket #12 at 21.

The SJC considered and rejected this claim to exercise its authority under M.G.L. c. 278,

§ 33E, to reduce the jury's verdict or to order a new trial. Williams, 450 Mass. at 777-78. Claims

concerning whether or not the SJC should exercise this authority under M.G.L. c. 278, § 33E are

not reviewable in a federal habeas corpus proceeding. Estelle, 502 U.S. at 67-68; Lewis, 497 U.S.

at 780.

G. The Sufficiency of the Evidence

Williams also challenges the sufficiency of the evidence – specifically, he asserts that the

Commonwealth failed to show that there was another venturer in the joint venture of murder of

which he was convicted.

Jackson v. Virginia, 443 U.S. 307 (1979), governs Williams' sufficiency of the evidence

claim.  It directs the Court to determine "whether, after viewing the evidence in the light most

favorable to the prosecution, *any* rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt." Id. at 319 (emphasis in original).  Where the record

supports conflicting inferences, a reviewing court "must presume—even if it does not

affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the

prosecution, and must defer to that resolution." Id. at 326.  The prosecution does not bear the

burden of excluding every hypothesis other than guilt beyond a reasonable doubt, only reasonable

doubts must be excluded. Id.; Stewart v. Coalter, 48 F.3d 610, 616 (1st Cir. 1995).

        Williams does not challenge the Massachusetts law governing the elements of a joint

venture,[2] but only the SJC's determination that sufficient evidence supported the verdict.  After an

examination of the record, the SJC determined that the Commonwealth's evidence was sufficient

to permit the jury reasonably to conclude that others were involved in the victim's shooting.

> It could also be reasonably inferred by the jury that more than one person was needed
> to bind the victim and place him in the trunk of his automobile. Brimage testified that
> the defendant was accompanied by Carter, Ennis, and another man when she let them
> into the Staniford Street apartment at 5 a.m. on December 26. Carter and the other
> man left the apartment by 8 a.m. The [petitioner] told Phillips that "we" had to take
> the victim for a ride on Christmas night, and that he had to leave the victim in his
> trunk. He told Brimage that if he went down, "so don't a whole lot of other people "

---

[2]  Williams did not challenge the state court's recitation of the elements of joint venture.
Under Massachusetts law the prosecution must establish, beyond a reasonable doubt: (1) that the
defendant was present at the scene of the crime; (2) with knowledge that another intends to
commit the crime or with intent to commit a crime; and (3) by agreement is willing and available
to help the other if necessary. See Commonwealth v. Gonzalez, 443 Mass. 799, 806 (2005)
(citing Commonwealth v. Bianco, 388 Mass. 358, 366 (1983)). "The elements of the [crime of
murder] are not determined or influenced by whether the defendant was the sole perpetrator or
only one of several participants in the crime [] [as long as] [t]he evidence was sufficient to show
that the defendant was at least a participant, even if he was not the sole perpetrator, and that he
possessed the state of mind required for guilt. Nothing further is required for conviction." See
Gonzalez, 443 Mass. at 806 (quoting Commonwealth v. Dyer, 389 Mass. 677, 683 (1983)).

(emphasis added).

Williams, 450 Mass. at 653.

The SJC's determination was objectively reasonable and not an unreasonable application of clearly established federal law.  Accordingly, I recommend that the Court reject this claim.

H. Failure to Properly Re-Instruct the Jury

In both his Petition and the table of contents to his brief in support of his Petition, Williams identifies a claim arising from the trial court's failure to properly re-instruct the deliberating jury when it sought guidance on the law of joint venture. Docket # 1 at 16-17; Docket # 12 at 3.  He suggests that the jury was impermissibly confused.

The SJC recited that,

"[o]n the second day of their deliberations, the jury sent the judge a written note asking, "On the law of joint venture pertaining to this case, does it only refer to only the two defendants, Williams and Ennis?" The judge and the prosecutor considered the question confusing. The defendant's trial counsel and Ennis's trial counsel asked the judge to tell the jury to "confine" themselves to determining "was [the defendant] a joint venturer with [Ennis] or was [Ennis] a joint venturer with [the defendant]." The judge declined to give the instruction, stating that he did not understand the jury's question. Over the defendant's objection (and Ennis's), the judge sent the following written response to the jury: "Jurors: I am unable to answer your question because I do not understand it."

The judge anticipated that the jurors might clarify their question. Shortly thereafter, the judge received another written question from the jury, "Can one defendant be found guilty of joint venture and the other defendant found not guilty?" Without objection, the judge responded, "Yes."

Williams, 450 Mass. at 653-54.

Williams did not address the merits of this claim in his brief, however.[3]  Arguments not

---

[3]  Although it is not clear to which claims he refers, Williams seems to indicate that time constraints and a broken photocopy machine prevented him from briefing this claim. Docket # 12 at 24.  Although Williams made a non-emergency motion for an extension of time to file his

briefed are deemed waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir.), cert. denied, 494 U.S. 1082 (1990); Gilday v. Callahan, 59 F.3d 257, 273 n. 23 (1st Cir.1995).

In any event, this is primarily a recasting of the challenge – already rejected – to the sufficiency of the evidence of a joint venture.  Moreover, Williams' Petition frames the claim in terms of state law.  Docket # 1 at 17.  State law claims are not reviewable in a federal habeas corpus proceeding. Estelle, 502 U.S. at 67-68; Lewis, 497 U.S. at 780.

I.  Abuse of Discretion in Denying Rule 25 Motion

An identical analysis applies to Williams' claim that the state court abused its discretion in denying his Massachusetts Rule Crim. P. Rule 25(b)(2) motion for a new trial because "the antagonistic defense presented by codefendant prejudiced Jaear Williams' Defense." Docket # 12 at 24; Docket # 1 at 18.  Again, Williams has not briefed the claim and it waived.  Zannino, 895 F.2d at 17.  Again, Williams' Petition in no way suggests that the claim depends on anything other than an error in the application of state law, a type of claim not cognizable in a habeas proceeding.  Estelle, 502 U.S. at 67-68; Lewis, 497 U.S. at 780.

---

brief (Docket # 11), he did not await a ruling and filed his brief six days later, on schedule. Docket # 12.

IV.     CONCLUSION

For the foregoing reasons, I recommend that the Court DENY the Petitioner Jaear

Williams's Petition for Writ of Habeas Corpus (Docket # 1).[4]

/s/ Leo T. Sorokin
LEO T. SOROKIN
United States Magistrate Judge

---

[4] The parties are hereby advised that any party who objects to these proposed findings and recommendations must file a written objection thereto within 14 days of receipt of this Report and Recommendation.  The written objections must identify with specificity the portion of the proposed findings, recommendations, or report to which objection is made, and the basis for such objections.  See Fed. R. Civ. P. 72 and Habeas Corpus Rule 8(b).  The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with Rule 72(b) will preclude further appellate review of the District Court's order based on this Report and Recommendation.  See Keating v. Secretary of Health and Human Services, 848 F.2d 271 (1st Cir. 1988); United States v. Emiliano Valencia-Copete, 792 F.2d 4 (1st Cir. 1986); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980); United States v. Vega, 678 F.2d 376, 378-379 (1st Cir. 1982); Scott v. Schweiker, 702 F.2d 13, 14 (1st Cir. 1983); see also Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466 (1985).